IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
No. 7:18-CV-79-D

| | |
|---|---|
| SOHO WILMINGTON LLC, | )<br>) |
| Plaintiff, | )<br>) |
| v. | )    **ORDER**<br>) |
| BARNHILL CONTRACTING COMPANY<br>and SCP-EW RIVER PlACE, LLC, | )<br>)<br>) |
| Defendants. | )<br>) |

On July 30, 2018, SOHO Wilmington, LLC ("SOHO" or "plaintiff") filed an amended complaint alleging a nuisance claim under North Carolina law against SCP-EW River Place, LLC ("SCP-EW") and Barnhill Contracting Company ("Barnhill"; collectively, "defendants"). See Am. Compl. [D.E. 33]. On January 10, 2019, the court denied defendants' motion to dismiss the amended complaint [D.E. 48]. On March 17, 2020, defendants moved for partial summary judgment [D.E. 63] and filed a statement of material facts and memorandum in support [D.E. 64, 65]. On the same date, defendants moved to exclude the expert report of SOHO expert Erik Hector [D.E. 66, 67]. On April 7, 2020, SOHO responded in opposition to defendants' partial summary judgment motion [D.E. 68, 69, 70] and motion to exclude [D.E. 71]. On April 24, 2020, defendants replied to SOHO's response to defendants' partial summary judgment motion [D.E. 72]. As explained below, the court denies defendants' motion for partial summary judgment and denies defendants' motion to exclude Hector's expert report.

I.

In denying defendants' motion to dismiss, the court discussed at length the construction around the Hotel Ballast in Wilmington, North Carolina, the relationships among the parties, and SOHO's nuisance claim. See [D.E. 48] 1–3. The court incorporates that discussion by reference.

In 2016, Cape Fear Public Utility Authority ("CFPUA") entered into an agreement with Water Street Ventures (the predecessor-in-interest to SCP-EW) concerning water and sewer work underneath North Water Street and Grace Street (i.e., the "PS9" agreement) in Wilmington, North Carolina. See [D.E. 64-3] ("Agreement For The Installation of Public Facilities With Cost Sharing"). The PS9 agreement related to Water Street Ventures's contract with the City of Wilmington to build River Place. See [D.E. 64] ¶¶ 2, 6; [D.E. 69] ¶¶ 2, 6. The PS9 agreement required, inter alia, periodically closing Water Street for construction of a sewer line, that CFPUA pay the majority of the project's costs, and that CFPUA be the "end user" of the sewer line. [D.E. 64] ¶ 6; see [D.E. 69] ¶ 6.

Barnhill served as SCP-EW's construction manager and general contractor. The parties dispute whether Barnhill's work was "governed by the terms and conditions of agreements entered into" among SCP-EW, CFPUA, and the City of Wilmington (i.e., the PS9 agreement). [D.E. 64] ¶ 5; see [D.E. 69] ¶ 5. The parties also dispute whether Barnhill worked "closely" with SOHO to coordinate closures of SOHO's entrances on Water Street, and whether the City of Wilmington facilitated communication between SOHO and Barnhill. [D.E. 64] ¶ 6; see [D.E. 69] ¶ 6.

The PS9 project was scheduled to begin on January 3, 2018, and finish on March 22, 2018. However, Barnhill did not begin work on the PS9 project until January 17, 2018, and Barnhill did not complete the PS9 project on March 22, 2018. See [D.E. 64] ¶ 7; [D.E. 69] ¶ 7. The parties dispute why Barnhill failed to timely complete the PS9 project. Defendants assert that the weather conditions, soil conditions, below-grade structures, improperly sized structures, and delays in approvals "led to unforseen delays" that resulted in defendants' failure to complete the work as scheduled. [D.E. 64] ¶¶ 7–9. SOHO asserts that Barnhill's work was not acceptable to the CFPUA, leading to a lengthy delay and preventing "substantial completion" by December 2019. See [D.E. 64] ¶ 7; [D.E. 69] ¶ 7.

In 2019, "settling" sewer pipes led to closure of Water Street. The parties dispute whether Barnhill knew what caused the sewer pipes to settle and how long Water Street was closed. SOHO states that Barnhill sent a letter to its sub-contractor discussing the cause of settling, and that Water Street was closed from January to June 2, 2019. Defendants respond that "no one is completely sure" why the sewer pipes settled, and the closure was for a six-week repair period. [D.E. 64] ¶ 10; see [D.E. 69] ¶ 10. The parties also dispute the City's and CFPUA's role in the PS9 project. See [D.E. 64] ¶ 11; [D.E. 69] ¶ 11.

During construction on the PS9 project, SOHO guests could access the hotel from at least one of SOHO's two entrances on Water Street. The construction never closed both entrances. See [D.E. 64] ¶ 6; [D.E. 69] ¶ 6. Specifically, the north entrance to SOHO on Water Street remained open throughout the PS9 project, while the south entrance was closed at certain times. See [D.E. 64] ¶ 8; [D.E. 69] ¶ 8. The PS9 project construction proceeded in phases so that SOHO would have access to the south entrance to its property on Water Street as much as possible. Additionally, Water Street was closed to traffic throughout the PS9 project for various construction reasons. See [D.E. 64] ¶ 9; [D.E. 69] ¶ 9. The parties dispute who directed the closures. SOHO contends that Barnhill directed the street closures on a day-to-day basis. See [D.E. 69] ¶ 9. Defendants counter that '[t]he communication between Barnhill and [SOHO] was coordinated and conducted by the City of Wilmington." [D.E. 64] ¶ 6.

II.

Summary judgment is appropriate when, after reviewing the record as a whole, the court determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a); Scott v. Harris, 550 U.S. 372, 378 (2007); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). The party seeking summary judgment must initially demonstrate the absence of a genuine issue of material fact or the absence of evidence to support the nonmoving party's case. See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once

3

the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in its pleading, see Anderson, 477 U.S. at 248–49, but "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis and quotation omitted). A trial court reviewing a motion for summary judgment should determine whether a genuine issue of material fact exists for trial. See Anderson, 477 U.S. at 249. In making this determination, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. See Harris, 550 U.S. at 378.

A genuine issue of material fact exists if there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. See Anderson, 477 U.S. at 249. "The mere existence of a scintilla of evidence in support of plaintiff's position [is] insufficient . . . ." Id. at 252; see Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) ("The nonmoving party, however, cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another."). Only factual disputes that affect the outcome under substantive law properly preclude summary judgment. See Anderson, 477 U.S. at 248.

A.

Defendants argue that borrowed governmental immunity bars SOHO's nuisance claim concerning the closure of Water and Grace Streets.[1] In support, defendants note that they completed the PS9 project to "further [SCP-EW's] contracts with the City and CFPUA at the direction and control of both the City and CFPUA," and SOHO did not allege that defendants acted negligently. [D.E. 65] 3. Moreover, defendants argue that a municipal contractor cannot be held personally liable

---

[1] Although defendants style their motion as one for summary judgment without qualification, the parties agree that defendants' arguments focus solely on SOHO's nuisance claim concerning closure of and construction on Water and Grace Streets, not SOHO's nuisance claim concerning other injuries. See [D.E. 68] 20–21; [D.E. 65] 9. Thus, the court limits its analysis to SOHO's nuisance claim concerning closure of and construction on Water and Grace Streets.

4

for public improvement projects absent negligence (i.e., what defendants label borrowed governmental immunity). Defendants then argue that public improvement projects concern either a public use or a public benefit and note that CFPUA and the City own Water Street and Grace Street. Furthermore, according to defendants, installing a sewer system or closing a street are governmental functions with a public use, and defendants worked on the PS9 project pursuant to contracts with the City and CFPUA. Thus, defendants argue that their PS9 work on Water Street and Grace Street was a public improvement project and SOHO must allege and prove that defendants acted negligently to overcome borrowed governmental immunity. Because SOHO did not allege that defendants acted negligently, defendants contend that they are entitled to borrowed governmental immunity on SOHO's nuisance claim concerning closure of and construction on Water and Grace Streets. See id. at 5–11; [D.E. 72] 3–9.

SOHO responds that Barnhill's tenth and fourteenth affirmative defenses do not provide meaningful notice to SOHO that Barnhill planned to raise a governmental immunity defense; therefore, Barnhill waived any such defense. [D.E. 68] 10–12.[2] As for Barnhill's tenth affirmative defense, it states:

> As a Tenth Defense and Answer, the commercial development of SCP-EW River Place, LLC's property and associated construction of water and sewer lines, alleged to constitute a nuisance in Plaintiff's First Amended Complaint, is now, and at all times material is in furtherance of a legislative determination that the business of SCP-EW River Place, LLC and Barnhill are in the public interest, and that the private interests of plaintiffs must yield to the public good, convenience, and necessity when the business of SCP-EW River Place, LLC and Barnhill are operated and conducted in compliance with the law.

---

[2] SOHO and the cases upon which it relies refer to a failure to plead an affirmative defense under Federal Rule of Civil Procedure 8(c) as a "waiver." In fact, SOHO argues Barnhill forfeited its immunity defense because Barnhill's pleadings are so vague that they fail to raise it. See Hamer v. Neighborhood Hous. Servs. of Chi., 138 S. Ct. 13, 17 n.1 (2017) ("The terms waiver and forfeiture — though often used interchangeably by jurists and litigants — are not synonymous. Forfeiture is the failure to make timely assertion of a right; waiver is the intentional relinquishment or abandonment of a known right.") (cleaned up). Nevertheless, in accordance with the Fourth Circuit's cases, the court discusses a failure to plead an affirmative defense as a "waiver."

5

[D.E. 51] 10. SOHO argues that because Barnhill's tenth affirmative defense does not mention "immunity" or "eminent domain," Barnhill waived any governmental immunity defense. As for Barnhill's fourteenth affirmative defense, it states: "As a Fourteenth Defense and Answer, Barnhill raises all applicable defenses asserted by SCP-EW River Place, LLC in response to Plaintiff's First Amended Complaint." Id. SOHO concedes that SCP-EW raised a governmental immunity defense, but argues that Barnhill's fourteenth affirmative defense "is too vague and generalized to put [SOHO] on notice" that Barnhill intended to assert a governmental immunity defense. [D.E. 68] 11. In support of its arguments, SOHO cites South Wallace Edwards & Sons, Inc. v. Cincinnati Insurance Co., 353 F.3d 367, 372–74 (4th Cir. 2003), Sales v. Grant, 224 F.3d 293, 296 (4th Cir. 2000), and Sisk v. Abbott Laboratories, 298 F.R.D. 314, 317 (W.D.N.C. 2014). See [D.E. 68] 11–12.

A "party must affirmatively state any avoidance or affirmative defense." Fed. R. Civ. P. 8(c)(1); Suntrust Mortg., Inc. v. United Guar. Residential Ins. Co. of N.C., 508 F. App'x 243, 252 (4th Cir. 2013) (unpublished) (alteration and quotation omitted). "[B]oth qualified and absolute immunity are affirmative defenses that must be pleaded." Bentley v. Cleveland Cnty. Bd. of Cnty. Comm'rs, 41 F.3d 600, 604 (4th Cir. 1994). Generally, a defendant's failure to plead an affirmative defense waives that defense. See, e.g., Suntrust Mortg., Inc., 508 F. App'x at 252. A court should not, however, find an affirmative defense waived unless the plaintiff demonstrates either prejudice or unfair surprise from a defendant's failure to plead it. See, e.g., Cincinnati Ins. Co., 353 F.3d at 372–74 (4th Cir. 2003); Peterson v. Air Line Pilots Ass'n, Int'l, 759 F.2d 1161, 1164 (4th Cir. 1985).

Having reviewed the record, the court holds that Barnhill adequately pleaded a governmental immunity affirmative defense. Moreover, the cases that SOHO cites are distinguishable. In Sisk, the defendant pleaded "any and all defenses that are or may become available" under the North Carolina Product Liability Act, a limitless universe of potential defenses that failed to provide "meaningful notice" to the plaintiff. See Sisk, 298 F.R.D. at 317. No such limitless universe exists

6

here. In Cincinnati Insurance Co., defendants did not raise the statute-of-limitations affirmative defense until summary judgment. See Cincinnati Ins. Co., 353 F.3d at 372–74. In contrast, here defendants raised the defense in their answer. In Sales, defendants pleaded a qualified immunity defense, but did not press that defense until the case was remanded to the district court. See Sales, 224 F.3d at 296. Not so here.

Alternatively, SOHO has failed to demonstrate that it suffered surprise or unfair prejudice from Barnhill pressing its governmental immunity defense at summary judgment. On the contrary, SOHO's response to defendants' motion demonstrates that it had time to consider and respond to Barnhill's alleged governmental immunity defense. See, e.g., Brinkley v. Harbour Recreation Club, 180 F.3d 598, 612–13 (4th Cir. 1999), overruled on other grounds by Desert Palace v. Costa, 539 U.S. 90 (2003). Accordingly, the court rejects SOHO's Rule 8(c) arguments.

B.

Defendants seek partial summary judgment and argue that they are immune from SOHO's nuisance claim concerning the closure and construction on Water and Grace Street due to "borrowed sovereign immunity." [D.E. 65] 3; see [D.E. 72] 1. Under North Carolina law, "[g]overnmental immunity is that portion of the State's sovereign immunity which extends to local governments." Wray v. City of Greensboro, 370 N.C. 41, 47, 802 S.E.2d 894, 898 (2017). Generally, sovereign immunity bars tort lawsuits against the state absent waiver. See id. at 47, 802 S.E.2d at 898. "In order to overcome a defense of governmental immunity, the complaint must specifically allege a waiver of governmental immunity. Absent such an allegation, the complaint fails to state a cause of action." Id. at 47, 802 S.E.2d at 899.

North Carolina law also recognizes a separate, common law doctrine protecting contractors of government entities. Under that doctrine, a "contractor or agent lawfully acting on behalf of a principal to whom the right of eminent domain has been accorded, in making a proposed public improvement, cannot be held personally liable for damages if such improvement is made without

7

negligence on his part." Horne v. City of Charlotte, 41 N.C. App. 491, 495, 255 S.E.2d 290, 293 (1979); see Guilford Realty & Ins. Co. v. Blythe Bros. Co., 260 N.C. 69, 79–80, 131 S.E.2d 900, 907–08 (1963); Moore v. Clark, 235 N.C. 364, 367–68, 70 S.E.2d 182, 185 (1952); White v. Nw. Prop. Grp.-Hendersonville No. 1, LLC, 225 N.C. App. 810, 814–15, 739 S.E.2d 572, 575–76 (2013); cf. Clark v. Asheville Contracting Co., 316 N.C. 475, 487, 342 S.E.2d 832, 838–39 (1986). The common-law contractor immunity defense derives from agency principles and a public entity's eminent domain power. See White, 225 N.C. App. at 815, 739 S.E.2d at 576; Horne, 41 N.C. App. at 494, 255 S.E.2d at 293. As the North Carolina Court of Appeals explained in Horne, "[t]he public agency and not the contractor is the party clothed with the power of eminent domain, and if there is to be any special or unforeseen liability attached to the exercise of this power then it should be borne by the agency as an incident to the peculiar power." Horne, 41 N.C. App. at 495, 255 S.E.2d at 293 (quotation omitted). North Carolina common-law contractor immunity doctrine is distinct from governmental immunity. See, e.g., Moore, 235 N.C. at 367–68, 70 S.E.2d at 185; White, 225 N.C. App. at 814–15, 739 S.E.2d at 575–76; Horne, 41 N.C. App. at 495, 255 S.E.2d at 293.

Defendants' argument conflates common-law contractor immunity and governmental immunity (i.e., sovereign immunity). Specifically, defendants rely on the common-law contractor immunity doctrine described in Moore, Horne, and White, but ask the court to engraft an element applicable to the governmental immunity defense described in Wray (i.e., that a plaintiff must plead and prove defendants acted negligently). Notably, defendants' immunity argument rests on the City of Wilmington's and CFPUA's eminent domain power concerning the public improvement of a sewer beneath Water and Grace Streets, not on either entity's governmental immunity. Thus, defendants are asserting a North Carolina common-law contractor immunity defense. See, e.g., Moore, 235 N.C. at 367–68, 70 S.E.2d at 185; White, 225 N.C. App. at 814–15, 739 S.E.2d at 575–76; Horne, 41 N.C. App. at 495, 255 S.E.2d at 293. Although defendants invite the court to expand North Carolina public policy to mandate that SOHO plead and prove defendants' negligence

8

to defeat defendants' common-law contractor immunity defense, the court declines the invitation. As the Supreme Court of North Carolina discussed in Wray and Guilford Realty, common-law contractor immunity and governmental immunity are distinct doctrines under North Carolina law. Compare Guilford Realty & Ins. Co., 260 N.C. at 79–80, 131 S.E.2d at 907–08 (discussing common-law contractor immunity) with Wray, 370 N.C. at 47, 802 S.E.2d at 898 (discussing sovereign immunity, including governmental immunity which "is that portion of the State's sovereign immunity which extends to local governments"); see also Clark, 316 N.C. at 486–87, 342 S.E.2d at 838–39 (discussing both governmental immunity and common-law contractor immunity); White, 225 N.C. App. at 814–15, 739 S.E.2d at 575–76 (same). Furthermore, under North Carolina law, common-law contractor immunity does not require a plaintiff to plead and prove negligence. Rather, under North Carolina law, defendants who assert the affirmative defense of common-law contractor immunity must demonstrate that (1) they were lawfully acting on behalf of a principal with the right of eminent domain; (2) the project resulted in a taking; (3) the project was a public improvement project; and (4) they did not act negligently concerning the project. See Clark, 316 N.C. at 487, 342 S.E.2d at 839; Moore, 235 N.C. at 367–68, 70 S.E.2d at 185; White, 225 N.C. App. at 814–15, 739 S.E.2d at 575–76; Horne, 41 N.C. App. at 495, 255 S.E.2d at 293.

Viewing the evidence in the light most favorable to plaintiff, a genuine issue of material fact exists concerning whether defendants acted negligently. See [D.E. 68] 12–16.[3] Thus, a jury must decide whether defendants negligently completed the PS9 project or negligently repaired the sewer under Water Street, thereby closing Water and Grace Streets longer than planned.

---

[3] Under North Carolina law, negligence claims consist of four elements: "(1) duty, (2) breach, (3) causation, and (4) damages." Bryant v. Adams, 116 N.C. App. 448, 465, 448 S.E.2d 832, 841 (1994); see Holley v. Burroughs Wellcome Co., 318 N.C. 352, 355, 348 S.E.2d 772, 774 (1986); Morgan v. Cavalier Acquisition Corp., 111 N.C. App. 520, 528, 432 S.E.2d 915, 919, disc. review denied, 335 N.C. 238, 439 S.E.2d 149 (1993).

9

In opposition, defendants make a conclusory argument and insist that SOHO bears the burden of pleading and proving defendants' negligence.[4] The court rejects the arguments and denies defendants' motion for partial summary judgment.

Alternatively, the common-law contractor immunity defense fails because the PS9 project did not result in a taking. Each North Carolina case applying the common-law contractor immunity doctrine concerned a third party exercising eminent domain power in a public entity's name that resulted in a taking for public use. See Clark, 316 N.C. at 487, 342 S.E.2d at 839 ("As the acts complained of in the present case were not a taking for public use, however, the borrowed immunity rule of Moore has no applicability, and the Court of Appeals' reliance was misplaced."); see also Moore, 235 N.C. at 367–68, 70 S.E.2d at 185; White, 225 N.C. App. at 814–15, 739 S.E.2d at 575–76; Horne, 41 N.C. App. at 495–96, 255 S.E.2d at 293–94. Although the parties agree that the PS9 project concerned a public improvement to Water Street, SOHO had access to its property through at least one entrance during the PS9 project. See [D.E. 65] 9–10. Thus, there was no taking. See City of Charlotte v. Univ. Fin. Props., LLC, 246 N.C. App. 396, 401, 784 S.E.2d 587, 591–92 ("[S]o long as the landowner can still access his property . . . , any modifications to the roadway that may alter the flow of traffic are not takings."). Accordingly, defendants cannot assert North Carolina's common-law contractor immunity defense, and the court denies defendants' motion for partial summary judgment.

### III.

Defendants also move to exclude SOHO expert Erik Hector's ("Hector") expert report under Federal Rule of Evidence 702. See [D.E. 66, 67]. In his report, Hector opines on the economic impact of the PS9 project on SOHO. See [D.E. 67-1] 1–11. In their motion to strike, defendants

---

[4] Defendants' negligence argument is the following sentence: "The uncontroverted evidence demonstrates that Defendant Barnhill's operations with respect to the PS9 work was reasonable given the professional skill and care ordinarily provided by general contracting firms practicing in the same or similar locality under the same or similar circumstances. [Exhibit 1]" [D.E. 72] 8–9.

10

make three arguments: (1) Hector's report is speculative; (2) Hector's opinions are not reliable; and (3) Hector's report fails to demonstrate that defendants substantially and unreasonably interfered with SOHO's use and enjoyment of its property. See [D.E. 67] 4–10.

Rule 702 of the Federal Rules of Evidence governs the admission of expert testimony. See Fed. R. Evid. 702. Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Rule 702 "assign[s] to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 597 (1993). "Rule 702 was intended to liberalize the introduction of relevant expert evidence," but "expert witnesses have the potential to be both powerful and quite misleading." Cooper v. Smith & Nephew, Inc., 259 F.3d 194, 199 (4th Cir. 2001) (quotations omitted).

The proponent of the expert testimony must establish its admissibility by a preponderance of the evidence. Id. A district court has broad latitude in determining whether to admit proposed expert testimony. See, e.g., McKiver v. Murphy-Brown, LLC, No. 19-1019, 2020 WL 6787917, at *12, 15 (4th Cir. Nov. 19, 2020); United States v. Gastiaburo, 16 F.3d 582, 589 (4th Cir. 1994); Silicon Knights, Inc. v. Epic Games, Inc., No. 5:07-CV-275-D, 2011 WL 6748518, at *5 (E.D.N.C. Dec. 22, 2011) (unpublished).

Courts have distilled Rule 702's requirements into two crucial inquiries: whether the proposed expert testimony is relevant and whether it is reliable. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999); Daubert, 509 U.S. at 589; United States v. Forrest, 429 F.3d 73, 80 (4th

11

Cir. 2005). The trial court must perform its special gatekeeping obligation of ensuring that expert testimony meets both requirements. See, e.g., Kumho Tire, 526 U.S. at 147.

To be relevant, the proposed expert testimony must be helpful to the trier of fact. See Daubert, 509 U.S. at 591–92; United States v. Campbell, 963 F.3d 309, 314 (4th Cir. 2020). "Testimony from an expert is presumed to be helpful unless it concerns matters within the everyday knowledge and experience of a lay juror." Kopf v. Skyrm, 993 F.2d 374, 377 (4th Cir. 1993). The relevancy requirement has been described as a question of "fit," and demands that "'expert testimony proffered in the case [be] sufficiently tied to the facts of the case [so] that it will aid the jury in resolving a factual dispute.'" Daubert, 509 U.S. at 591 (quoting United States v. Downing, 753 F.2d 1224, 1242 (3d Cir. 1985)). To be relevant, proffered expert testimony must only "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702; see Daubert, 509 U.S. at 591–92. Rule 702 does not require that "proffered expert testimony [be] irrefutable or certainly correct." Silicon Knights, Inc. v. Epic Games, Inc., No. 5:07-CV-275-D, 2011 WL 5151345, at *3 (E.D.N.C. Oct. 28, 2011) (unpublished).

"[T]he test of reliability is flexible and the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." United States v. Wilson, 484 F.3d 267, 274 (4th Cir. 2007) (quotations omitted); see Kumho Tire, 526 U.S. at 141–42. "In making its initial determination of whether proffered testimony is sufficiently reliable, the court has broad latitude to consider whatever factors bearing on validity that the court finds to be useful; the particular factors will depend upon the unique circumstances of the expert testimony involved." Westberry v. Gislaved Gummi AB, 178 F.3d 257, 261 (4th Cir. 1999). In analyzing reliability, a court should consider factors such as:

> (1) whether a theory or technique can be or has been tested; (2) whether it has been subjected to peer review and publication; (3) whether a technique has a high known or potential rate of error and whether there are standards controlling its operation; and (4) whether the theory or technique enjoys general acceptance within a relevant scientific community.

12

Cooper, 259 F.3d at 199; see Daubert, 509 U.S. at 592–94; Silicon Knights, Inc., 2011 WL 6748518, at *6.

As for speculation, defendants' expert Henry B. Staley, Jr. ("Staley") opines that Hector did not consider numerous "critical" data points in his analysis and did not analyze the hotel's future market performance. See [D.E. 67] 5–6. Defendants also argue that Hector's damages analysis did not contemplate the role of guest preference. See id. at 6–7. Finally, defendants argue that Hector did not consider how competing downtown Wilmington hotels affected SOHO. See id. at 7. Essentially, defendants argue that because Hector ignored a "substantial amount" of "relevant information," his opinions are "speculative and misleading." Id. at 8.

The court rejects defendants' arguments. Although Staley describes Hector's methods as "simplistic," defendants do not argue "that [Hector's] methods have not been tested, have not withstood peer review and publication, have excessive rates of error, have no standards for their application, or have not been accepted in their field." Schaefer, 325 F.3d at 240. Essentially, defendants attack what they perceive as a factual inadequacy in Hector's analysis. Such attacks, however, go to the weight a jury should give Hector's report, not its reliability. Defendants "can cross-examine [Hector] at trial about the depth of his investigation," including each point raised in their motion, "and the jury will decide how much weight to afford [Hector's] testimony." OmniSource Corp. v. Heat Wave Metal Processing Corp., No. 5:13-CV-772-D, 2015 WL 3452918, at *8 (E.D.N.C. May 29, 2015) (unpublished). Likewise, defendants can cross-examine Hector about his alleged failure to examine alternative causes for SOHO's decline in guests. See United States v. Chikvashvili, 859 F.3d 285, 294 (4th Cir. 2017); Cooper, 259 F.3d at 202. Thus, the court rejects defendants' argument that Hector's opinions are speculative.

As for reliability, defendants argue that Hector's opinions do not "satisfy" indicators of reliability and are contradicted by witness testimony. See [D.E. 67] 8–9. The argument ignores the technique Hector employed and merely parrots arguments that defendants made concerning

13

speculation. Thus, those arguments fare no better in assessing reliability. See Daubert, 509 U.S. at 592–94; Cooper, 259 F.3d at 199; Silicon Knights, Inc., 2011 WL 6748518, at *6.

Finally, defendants argue that Hector's report fails to discuss whether the road closures and construction prevented guests from staying at the hotel, or any other "use" or "enjoyment" of the property, the "question central to [SOHO's] private nuisance claims." [D.E. 67] 9–10. In essence, defendants assert that Hector's report is insufficient to support a jury finding for SOHO concerning its nuisance claim. The jury, however, gets to weigh Hector's testimony and the other evidence at trial and determine whether SOHO has proven its nuisance claim. Cf. McKiver, 2020 WL 6787917, at *12, 15; Lord & Taylor, LLC v. White Flint, L.P., 849 F.3d 567, 577 (4th Cir. 2017). Accordingly, the court denies defendants' motion to strike Hector's expert report.

IV.

In sum, the court DENIES defendants' motion for partial summary judgment [D.E. 63], and DENIES defendants' motion to strike Hector's expert report [D.E. 66]. The parties shall participate in a court-hosted settlement conference with United States Magistrate Judge Jones. If the conference is unsuccessful, the court shall schedule the matter for trial by separate order.

SO ORDERED. This 23 day of November 2020.

JAMES C. DEVER III
United States District Judge